CELESTE How, Respondent, v. THE UNION MUTUAL LIFE INSURANCE COMPANY, Appellant.

Defendant issued a policy of insurance, dated October 12, 1872, on the life of M., which contained a condition to the effect that if a note, other than the regular premium note, should be given for a portion of the premium, and if said note should not be paid "strictly in accordance with the provisions thereof" the policy would immediately become void; also, that no agent of the company, except its president or secretary, could waive or alter "any condition of the policy or of any such note." The insured, aside from the regular premium note, which was for $234, gave a note for $176, for a portion of the premium, payable six months from date, which stated for what it was given, and that the policy would immediately become void if the note was not paid at maturity. The policy was procured by M. through one R., who was agent for several insurance companies, other than defendant. When he had a larger amount of proposed insurance than he could place in his own companies he had occasionally applied to defendant, through its general agents in New York, delivering to them the application and receiving the policy and receipts for premiums. R. collected the annual premiums on such policies, and accounted to said general agents. The policy in question was obtained in this manner. R. wrote on the margin of the application his name, adding thereto "general agent." It was not claimed that he was general agent of the defendant, or that M. understood him to so be. At the time the two notes were given by M., he delivered to R. another note for $640, payable to the order of R., with collaterals, which note R. procured to be discounted; he delivered to defend-

ant the two premium notes, but retained the proceeds of the other note. No further payment of premium was made. M. died October 26, 1873. In an action on the policy, *held*, that R. was not the agent of defendant, and in taking the third note did not act for it; but that he merely occupied as to it the position of an insurance broker; that the delivery of said third note did not operate as a payment; and, the six months' note not having been paid when it was due, that the policy was forfeited.

The policy acknowledged receipts of the payment of the first premium. Soon after its delivery M. assigned it to plaintiff, who was his housekeeper, in consideration of her services, defendant consenting to the assignment, "subject to all the provisions and conditions of the policy." *Held*, that defendant was not estopped from denying the payment; that the acknowledgment was not that payment was made in cash, and the conditions showed that payments might and were contemplated to be made partly in notes; and, therefore, that plaintiff had no right to rest in the belief that the first premium was paid in cash; also that by the assignment plaintiff simply took the place of M. as owner of the policy, and took it subject to all its conditions.

There was no communication between plaintiff and defendant in reference to the policy until October 9, 1873, when plaintiff took the policy to defendant's agent at Philadelphia, and requested him to have it changed, so that she could pay the annual premiums quarterly instead of annually, and at Philadelphia instead of New York. Said agent forwarded the policy to defendant's main office at Boston, but did not hear from it until about November first. Between October ninth and twenty-sixth, plaintiff called at the office of the agent several times to pay the premium falling due October twelfth. The agent informed her he was not authorized to receive the money, but would send for renewal receipts, and that she would not be prejudiced by the delay. She said nothing, and the agent knew nothing, about the non-payment of the six months' note. About November first, defendant replied to the agent's letter, advising him as to said note and the forfeiture, of which he informed plaintiff the next time he saw her. Neither the agent nor defendant knew of the sickness of M. until after his death. *Held*, that there was no waiver of the previous forfeiture by the delay in answering the agent's letter; that, at most, it could only excuse the prompt payment of the second annual premium.

Also, *held*, that a waiver could not be inferred from the mere retention of the six months' note.

*Prentice* v. *K. L. Ins. Co.* (77 N. Y., 483), distinguished.

A witness, who was a clerk in the office of R., in October, 1872, after he had testified that he had no personal knowledge that R. procured the discount of the third note, and did not know where it was discounted; that all he knew was what R. told him, was asked if he knew what R. did with the proceeds of the note and the collaterals; this was objected to and excluded. *Held*, no error.

(Argued January 20, 1880; decided February 3, 1880.)

APPEAL from order of the General Term of the Supreme Court, in the second judicial department, reversing a judgment in favor of plaintiff, entered upon the report of a referee, and granting a new trial.

The nature of the action and the facts are set forth sufficiently in the opinion.

*Merritt E. Sawyer,* for appellant. The policy was forfeited by a failure to pay the note. No demand was necessary. The note and policy constitute one contract and should be read together. The recital in the policy that the first year's premium had been paid did not estop defendant from showing that a note had been taken for part of it which was not paid. The forfeiture cannot be relieved against in equity. (Big. on Life Ins. [2d ed.], 284–287; *Pitt* v. *Berkshire Life Ins. Co.,* 100 Mass., 500; 1 Big. Ins., 284; *Anderson* v. *St. Louis Mut. Life Ins. Co.* [U. S. Cir. Ct., W. Dist. of Tenn.], 5 Big. Ins. 527; *N. Y. Life Ins. Co.* v. *Stratham* [U. S. Sup. Ct.], 5 Big. Ins., 607; 93 U. S., 24; *Rohmer* v. *Knickerbocker Life Ins. Co.,* 4 Big. Ins., 278; 4 Daly, 512; *Baker* v. *Union Mut. Life Ins. Co.,* 43 N. Y., 283.) An assignee of a chose in action, holds only, by an equitable title, an equitable interest. (1 Parsons on Con. [6th ed.], 226, 229.) He takes the same subject to all the equities existing between the original parties; and the duty of making full inquiry as to the state and condition of the parties devolves upon him; the debtor not being bound to volunteer any information as to the equities. (*Mancles* v. *Dixon,* 18 Eng. Law and Eq. R., 82; *Bartlett* v. *Pearson,* 29 Me., 9–15; *Faul* v. *Timmerman,* 36 Penn., 108; *Bush* v. *Lathrop,* 22 N. Y., 535; *Trustees of Union College* v. *Wheeler,* 61 id., 88; *Crane* v. *Turner,* 67 id., 437; *Green* v. *Deal,* 64 id., 226; *Livingston* v. *Dean,* 2 Johns. Chy., 478; *Murray* v. *Winter,* 2 id., 441.) Only those to whom representations are made, or who are intended to be influenced thereby, can plead an estoppel. (Bigelow on Estoppels [2d ed.], 442, 476; *Kuhn* v. *Jersey City,* 8 C. E. Green, 84; *Mayenborg* v. *Haynes,* 50 N. Y., 675;

*Baker* v. *The Union Mut. Life Ins. Co.*, 43 id., 283, 289; Bispham's Principles of Equity [2d ed.], 354, § 290.) The party urging an estoppel must show that he has acted on the representation and parted with something, on the strength thereof. (Bigelow on Estoppel [2d ed.], 492; *McMaster* v. *Prest.*, etc., 55 N. Y., 222, 229; *Maloney* v. *Horan*, 49 id., 111.) Past consideration is not sufficient to found an estoppel upon. (*Mangles* v. *Dixon*, 18 E. Law and Eq., 82.) The representation must have been made to one who was ignorant of the truth. (Bigelow on Estoppel [2d ed.], 467.) The defendant being a purely mutual company of which every policy-holder is a member, plaintiff was bound to know its rules and regulations. (*Bingen* v. *Ins. Co.*, 7 Pa., 422.)

*B. F. Mudgett*, for respondent. The defendant having recognized the agency of Rhodes, and held him out as general agent to the insured, cannot now be permitted to deny Rhodes' authority because it alleges that Rhodes failed to pay over part of the money he then received. (*Mowrey* v. *Rosendale*, 74 N. Y., 360; *Bronson's Executor* v. *Chappell*, 12 Wall., 47.) The defendant is estopped from denying the truth of the recital in the policy, that it had received the first annual premium upon the making, and delivering the same to the assured. (*Dezell* v. *Odell*, 3 Hill, 215; *Plumb* v. *Cattaraugus Ins. Co.*, 18 N. Y., 392; *Continental Bk.* v. *Bk. of Commonwealth*, 50 id., 575; *Voorhies* v. *Olmstead*, 66 id., 113; *Lyons* v. *Munson*, 99 Otto, 684; *Goodwin* v. *Mass. Life Ins. Co.*, 73 N. Y., 480; *Knight* v. *Wiffen*, L. R. [5 Q. B.], 660; *Blair* v. *Wait*, 69 N. Y., 113; *Bank of U. S.* v. *Lee*, 13 Peters, 127; 26 Vt., 365.) Having shown that Rhodes kept a regular account with defendant, and paid over monthly his collections, it was competent to show what he did with this money received by him, as representative of defendant. (*Bowen* v. *Bank of New York*, 11 Hun, 226.)

Earl, J. This is an action upon a policy of insurance issued by the defendant to William N. Marcus upon his own

life, for the sum of $10,000. The policy is dated October 12, 1872, and contains the following conditions : " The full amount of premium must be paid on the day and in the manner herein provided for; and if any note, check or draft (except the regular premium note) shall be given and accepted in payment, or part payment, of any premium due, or to become due, such note, check, or draft, and also the annual interest on said regular premium note, must be paid strictly in accordance with the provisions thereof severally. If any such annual premium, or any such note, check, or draft, or such annual interest, shall not be so paid, then this policy shall immediately become void." " Premiums are payable at the company's office, in Boston, Mass. ; and no person whatever is authorized to collect payment elsewhere of any annual premium, except with a special certificate of such authority, signed by the secretary, stating the specific payment for which it is issued ; and attached to which must be the receipt to be given for that payment ; and such special certificate is the only evidence to the policy-holder of the authority of any person to receive the renewal premium." " No agent of this company, except the president or secretary, shall waive or alter any condition expressed in this policy, or in any note, check, or draft given to and accepted by the company in settlement of any premium, or parts of premium, for this policy." " Any assignment of this policy shall be void, unless assented to in writing by the president or secretary."

The annual premium was $586, and the first annual premium was paid as follows :   $176 in cash; a premium note for $234, payable twelve months after date to the order of the defendant, which embodied the following :   " And it is an express condition of the acceptance of this note by the said company, in part payment of the annual premium for policy No. 42,666, which condition is fully agreed to by the assured and the promissor herein, that such acceptance shall in no wise affect the condition in said policy that the non-payment of any other portion of said annual premium, or the

non-payment of the annual interest hereon, when due, shall, in either case, cause the immediate forfeiture of said policy ; " and a cash note (so called) for $176, payable six months after date to the order of the defendant, which embodied the following : "This being given in part pay- ment of the annual premium on policy No. 42,666 issued by the company, and all claims to further insurance and all benefits whatever, which full payment in cash of said annual premium would have secured, shall become immediately void and forfeit to said company if this note is not paid at maturity."

At the date of the policy, and prior and subsequent thereto, the plaintiff was in the service of Marcus as his housekeeper, and on the 22d day of November, 1872, in consideration of her services he assigned the policy to her, the defendant consenting thereto, "subject to all the provi- sions and conditions of the policy."

Marcus died October 26, 1873, and neither he nor the plain- tiff paid either of the two notes or any interest on either of them, or any more premium. The referee held that the policy became forfeited and void by the non-payment of the cash note in April, 1873, when it fell due, and on that ground defeated the plaintiff. The General Term reversed the judg- ment entered upon the report of the referee, both upon the law and the facts. Hence upon this review we must consider both questions of fact and law to the same extent that they were proper to be considered at the General Term.

We will first consider whether there could have been any recovery upon this policy if it had not been assigned, and then whether the plaintiff occupied by virtue of the assign- ment and her acts subsequent thereto any better position than the personal representatives of Marcus would have occu- pied. This policy was obtained for Marcus of the defendant by James A. Rhodes. The claim of the plaintiff is that Rhodes was in some sense the agent of the defendant, and that at the time the two notes (the premium note and the cash note) were given by Marcus, he made provision for

their payment by giving Rhodes his note, payable to the order of Rhodes, for $640, with collaterals, and that Rhodes subsequently procured that note to be discounted. The premium note and the cash note were delivered to the defendant, but neither the other note nor any of its proceeds was delivered to it. It does not appear what became of that note, nor when it was payable, and there is no evidence whatever that Marcus ever paid it. It does not appear what the collaterals were, nor how valuable they were, nor that Rhodes agreed to take the note for $640, with the collaterals, as payment in any way of the other two notes, or either of them, nor that he agreed to procure it to be discounted and to use the proceeds to pay upon such notes, nor that he exacted the note and collaterals as a condition of the insurance. That note did not operate as a payment of the cash note given for a portion of the first premium. Rhodes was in no sense the agent of the defendant to take that note. He was the agent in the city of New York in 1872 of several life insurance companies, but not of the defendant. Judd & Blauvelt were its general agents in that city. Rhodes was largely engaged in life insurance, and when he had a larger amount of proposed insurance upon any life than he could place in the companies of which he was the agent, he would seek other companies for the surplus; and one of the companies to which he resorted occasionally for such purpose was the defendant, and in that way he procured from the defendant as many as fifteen policies. He had no transactions or correspondence of any kind directly with the defendant at its general office in Boston, but his transactions were with Judd & Blauvelt. When he desired a policy from the defendant he would apply to Judd & Blauvelt, and take the application to them and procure from them a policy and receipts for the premium, and deliver the policy to the assured and receive the premium, and account with Judd & Blauvelt for it, deducting such commissions as they allowed him; and so, with receipts delivered to him by Judd & Blauvelt, he collected the annual premiums upon such poli-

cies, and he kept an account with them and rendered statements to them and settled with them when requested so to do. At the time this policy was obtained, Rhodes, who was an acquaintance and friend of Marcus, solicited him for insurance upon his life for $40,000 or $50,000, and this was one of the policies he procured him to take. The policy was delivered to Rhodes at the office of Judd & Blauvelt, and the two notes were there also written to be signed by Marcus and delivered to Rhodes, with the policy. Rhodes delivered the policy, and procured the signature of Marcus to the two notes, and returned them to Judd & Blauvelt, and never thereafter had anything to do with them or with the policy.

On the margin of the application Rhodes wrote his name, adding thereto " general agent." But there is no pretense that he was in fact general agent of the defendant, or that Marcus understood him to be. He styled himself a general insurance agent, as his business was a general life insurance agency, for several companies. As to the defendant, his relation was substantially that of an insurance broker. He was not in any proper sense its agent, and in procuring this policy he acted, mainly at least, as agent of Marcus. It is true that one witness, Stevens, testified that he was a sub-agent under Judd & Blauvelt; but four other witnesses equally cognizant of the facts, two of whom were Judd & Blauvelt, testified that he was not a sub-agent, but that in procuring policies from the defendant he acted as an insurance broker, and their evidence is entitled as matter of fact to the most weight. As broker he acted to some extent for both parties — for Marcus to obtain the policy, for the defendant to deliver it and to return to it the two notes and the balance of the premium in cash. He certainly had no other apparent or real authority from the defendant as to this policy. When the policy was delivered and the premium thus arranged, his authority as to the defendant was at an end, and he could do nothing more for it without fresh or further authority. He certainly had no authority to

waive or modify any condition contained in the policies or in the notes. In taking the note for $640, it is evident that he did not act for the defendant. That note was of no benefit in any way to it. The notes were both perfectly secured. If Marcus died before they were payable, they would be deducted from the amount due upon the policy. If not paid at maturity, the policy would be void. If Marcus gave this note to Rhodes, that he might procure the same to be discounted and use some of the proceeds to pay this cash note, then for such purpose he was the agent of Marcus.

Therefore, in any view that I can take of the facts of this case, this policy became void by the non-payment of the cash note, unless the plaintiff, by the assignment of the policy to her, and by what she did thereafter, is in some way relieved from the consequences of such non-payment.

The policy acknowledges the receipt of the payment of the first premium, and the plaintiff claims that she relied upon this, and thus omitted to prosecute inquiries and to make payments, as she otherwise would, and hence that the defendant should be estopped from denying the payment, and she cites, to uphold this claim, *The Continental Nat. Bank* v. *The Nat. Bank of Commonwealth* (50 N. Y., 575); *Voorhis* v. *Olmstead* (66 N. Y., 113), and other cases. But she had no right to rely upon this acknowledgment. It was not acknowledged that the payment had been made in cash, and the policy itself, as is seen by one of the conditions above set out, shows that payment of premiums might, in part at least, be made in notes and were expected so to be made, and that when so made, the policy would become void, unless the notes were paid at maturity. Hence she had no right to rest in the belief that the first premium had been paid in cash. By the assignment she simply took the place of Marcus as the owner of the policy, and she took it subject to all the conditions which he was required to keep and perform, one of which was to pay this note. When the defendant consented to the assignment in November, 1872,

this note was not due, and it was under no obligation to notify her of it. It could rightfully assume that she knew of its existence. It cannot, therefore, be properly said that the defendant in any way misled the plaintiff; and the claim that it is estopped from setting up non-payment of the cash note, is not well founded: (*Baker* v. *The Union Mut. L. Ins. Co.*, 43 N. Y., 283.)

I have also looked into the case to see if the forfeiture was waived by the defendant, and I can find nothing from which it can justly be inferred that it was waived. It does not appear that such waiver was claimed at the trial, or that the case was in any respect tried upon the theory of a waiver of that forfeiture. There was no finding or request to find in reference to it by the referee. I infer that such a claim was not made at the General Term, as it was not noticed in the only opinion there written, and it was not noticed nor presented upon the argument here. Upon the assumption that the note was not paid, the only answer which the plaintiff has thus far attempted to make to the forfeiture is that the defendant is estopped by consenting to the assignment of the policy with the acknowledgment of payment written therein. But I will give brief attention to the facts bearing upon this point. The cash note was left in the hands of defendant's agents in New York. The chief office of the company was at Boston. The note fell due in April, and from that time until the ninth day of October thereafter there was no communication whatever between the plaintiff and defendant, and no transactions whatever between them in reference to the note or the policy. Although the plaintiff and her brother testified that it was before that day, I am convinced by the circumstances and the evidence that it was on that day that she took her policy to Reynolds, the local agent of the defendant at Philadelphia, and requested him to have it changed, so that she could pay the annual premiums quarterly instead of annually, as provided in the policy; and she desired an arrangement by which she could make the payments in Philadelphia instead

of New York. Reynolds on the same day forwarded the policy to the defendant's Boston office, but did not hear from it until about November first, Marcus having died October twenty-six. In the meantime, between the ninth and twenty-sixth of October, the plaintiff had called at Reynold's office several times to pay the annual premium which fell due October twelve. Reynolds informed her that he was not authorized to receive the money, but that he would send for the renewal receipts, and he probably in substance said to her that she would not be prejudiced, under the circumstances, by the delay in paying the annual premium. He knew nothing about the cash note or its non-payment; she said nothing to him about it, and he had had no prior connection whatever with the policy. Reynolds did not hear from the defendant in response to his letter until about the time of the death of Marcus, and then he was informed of the cash note and the forfeiture, and the first time he saw the plaintiff afterward, which was about the first day of November, he informed her of the forfeiture. Neither the defendant nor Reynolds knew of the sickness of Marcus until after his death, and hence no bad faith can be attributed to them. The delay from October ninth to November first in returning the policy to the plaintiff is not explained. The case was so tried that an explanation was not needed. It doubtless took some time before the letter of Reynolds, containing the policy, could in regular routine be taken up and considered at the Boston office; and then correspondence with the New York agents in reference to the note and the transfer of this policy to the Philadelphia agency may have taken some time also. There is certainly no conclusive inference that the delay was unnecessary or unreasonable, and much less that it was from any design to mislead or take advantage of the plaintiff; and I cannot perceive how, from this delay—the defendant doing nothing, saying nothing— there can be any inference that it intended to waive the previous forfeiture. It declared the forfeiture the very first communication it made. The delay in no way harmed the

defendant; it may have excused the prompt payment of the second annual premium, and for that purpose alone the evidence in reference to it was introduced. If such evidence will justify an inference of the waiver of a forfeiture, then it will be quite difficult for any insurance company to claim a forfeiture in any case, however distinctly it may be provided for in a policy.

Nor can a waiver be inferred from the mere retention of the note by the defendant. It was not bound to do anything to make the forfeiture complete. It was not bound to seek out the plaintiff and surrender the note to her after the non-payment thereof. Even if it was bound upon demand to deliver up the note, it certainly was not bound to do so until demanded: (*Roehner* v. *The Knickerbocker Life Ins. Co.*, 63 N. Y., 160.)

Upon the point last discussed, the case of *Prentice* v. *The Knickerbocker Life Ins. Co.*[*] is not an authority. There the policy contained a condition that full proof of the death should be presented within twelve months after the death, or the claim under the policy would be forfeited. In that case the proof was not made until after the twelve months, and forfeiture was claimed by the company. The policy was dated August, 1867, and was upon the life of one Mitchell. On the 9th day of December, 1867, with the assent of the company, the policy was assigned to Prentice, and thereafter he paid the annual premiums. About the 1st day of July, 1872, Prentice, being about to go to Europe, paid to the general agent of the company in advance the premium to fall due August tenth thereafter. At the interview then had with the agent, Prentice raised the question as to the position of the parties in case the insured should die before the premium became due. The agent replied that the company had agents who would know of the death before he could, and that in any case, if he advanced the money, it would be returned, " and that there was no trouble at all in regard to that whole thing." Prentice returned from

[*] 77 N. Y., 483.

Europe in October, 1872. The insured died July 27, 1873; but his death did not become known either to Prentice or the company until July, 1875. In each of the years, 1873 and 1874, the defendant, supposing the insured to be alive, gave Prentice written notice of the day when the annual premium would fall due, and Prentice, upon the same supposition, paid those premiums and took receipts therefor from the company. When, in July, 1875, Prentice learned of the death, he immediately notified the company of the fact, and it forwarded him blanks to enable him to prepare the proofs, and they were prepared and delivered to the company on the ninth of that month. The proofs showed that the insured died in July, 1873. The company took the proofs, and kept them about three months without making any objection to the claim, and then it for the first time claimed the forfeiture on the ground that the proofs were not served within twelve months after the death. It retained the premiums paid after the death, and did not offer to return them until after the action was commenced. It was held that the circumstances justified the inference at the trial of a waiver of the forfeiture, and the judgment for the claim was affirmed. It is seen that the facts of that case are widely varient from those existing in this case.

After the witness Stevens, who was, in October, 1872, a clerk in the office of Rhodes, had testified that he had no personal knowledge that Rhodes had procured the discount of the note for $640, that he did not know when it was discounted, and that all he knew about the discount was what Rhodes told him, he was asked the following question by plaintiff's counsel : "Do you know what disposition Mr. Rhodes made of the proceeds of note and collaterals left with him by Marcus ?" Defendant's counsel objected to this as irrelevant and immaterial, and the objection was sustained. This ruling is now complained of as error. There was no pretense that these proceeds in any way reached the defendant, or that they were applied upon these notes, and the purpose of this question is not apparent. It is

impossible to perceive how this question could be material; and if there was any legitimate evidence which could have been elicited by it, the counsel for plaintiff should have stated it, so that the court could have seen the bearing of the question.

After the same witness had stated that Marcus made provision with Rhodes for the payment of the two notes, he was asked this question : " State what it was, and what was done ? " He answered : " Mr. Marcus gave a note for 640 odd dollars." Defendant's counsel then moved to strike out the words " 640 odd dollars," on the ground that it called for the contents of a written instrument, and the motion was granted. No harm was done by this ruling in any aspect of the case, as the same witness was subsequently permitted to describe the note as one for $640. Besides, if we are right in holding that Rhodes did not act for or bind the defendant in taking the note, the evidence as to its amount, and what Rhodes did with it or its proceeds, was wholly immaterial.

We are satisfied, therefore, that no error was committed by the referee. This is a case where the defendant is justified in standing upon the strict letter of its contract, and demanding that the plaintiff shall make out her case with reasonable clearness. There are not here the features of hardship and injustice which frequently attend forfeitures of insurance policies. For a payment of only $176, the defendant is sought to be made liable for $10,000 to a person who has really parted with nothing for the policy. There certainly should be no strained construction of the contract or of the facts, to enforce the liability.

The order of the General Term should be reversed, and judgment upon the report of the referee affirmed, with costs.

All concur, except Danforth, J., dissenting.

Order reversed and judgment affirmed.